IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
October 1, 2019 Session

## TRUMAINE WINTERS v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. 04-04042      Glenn I. Wright, Judge**

_____

### No. W2018-02090-CCA-R3-PC

_____

A Shelby County jury convicted the Petitioner, Trumaine Winters, of first-degree murder and aggravated robbery, and the trial court sentenced him to life in prison for the murder conviction plus twelve years for the robbery conviction. The Petitioner appealed his convictions and sentence to this court, and we affirmed the convictions but remanded for resentencing. *State v. Trumaine Winters*, No. W2007-00529-CCA-R3-CD, 2008 WL 2901616 (Tenn. Crim. App., at Jackson, July 24, 2008), *perm. app. denied* (Tenn. Apr. 13, 2015). The Petitioner filed a timely petition for post-conviction relief, alleging that his trial counsel was ineffective for improperly cross-examining key witnesses and for not objecting to prosecutorial misconduct. The post-conviction court denied the petition after a hearing. After review, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and NORMA MCGEE OGLE, JJ., joined.

Monica A. Timmerman, Memphis, Tennessee (at hearing), and Jessica L. Gillentine and Alexander D. Camp, Jackson, Tennessee (on appeal), for the appellant, Trumaine Winters.

Herbert H. Slatery III, Attorney General and Reporter; Zachary T. Hinkle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Leslie Byrd, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts
### A. Trial

This case originates from the Petitioner's conviction for the murder and

aggravated robbery of Marcus Crawford, the victim.

## A. Trial

The following is a summary by this court of the facts presented at trial:

The victim, Marcus Crawford, was twenty-eight years old when he was fatally shot during the course of an aggravated robbery in Shelby County. At trial, the State called eyewitness LaDonna Harris, who testified that on January 19, 2004, she resided in an apartment located at 268 Tillman in Memphis with her son and daughter and that the victim was her boyfriend. Ms. Harris recalled that shortly before midnight on January 19, the two children were in one bedroom of the apartment, and she and the victim were in the adjacent master bedroom when they heard a knock on the door. Mr. Crawford went into the living room to answer the door, and a few minutes later, Ms. Harris left the bedroom and walked down the hall to see Mr. Crawford talking to two men in the living room. Ms. Harris did not know the names of the two men at the time, but she recognized them from the neighborhood. On cross-examination, Ms. Harris testified that the two men had also visited her apartment that afternoon, after she arrived home from work, and that they inquired as to the whereabouts of Mr. Crawford. Ms. Harris described one of the men as "tall and skinny," and the other man as "short and dark-skinned." During her testimony, Ms. Harris identified the [Petitioner] as the "tall and skinny" man. She stated that the [Petitioner] wore a "gray hooded sweater with blue writing" during the robbery, and that the shorter man wore a "red hooded sweater." Ms. Harris testified that she saw the [Petitioner] pointing a gun at Mr. Crawford's head, and that when the [Petitioner] saw her enter the hallway, he ordered everyone to go back to the master bedroom. Ms. Harris and the victim went back to the bedroom as instructed, and the two men followed them.

Ms. Harris testified that, once they were all in the bedroom, the two men demanded money, and the shorter man pinned a struggling Ms. Harris behind the bedroom door "trying to smoosh [sic][her]" while the [Petitioner] pointed the gun at Mr. Crawford beside the bed. Harris told them that they did not have any money to give them, but that her purse was on the bed. The short man shook the purse and $80 in cash fell out, which he took and put in his pocket. Harris testified that the [Petitioner] kept pointing the gun at the victim, and that the victim was turned so that his back was facing the [Petitioner]. Harris testified that the [Petitioner] then shot Mr. Crawford in the back. She recalled that "they tussled for a couple

2

of minutes," during which time the gun went off again, leaving a bullet hole in her dresser. She stated that the men then dragged the victim out of the bedroom and into the living room. Ms. Harris stated that she heard the gun being fired again, and she later observed that a bullet had gone into the ceiling. Ms. Harris stated that the men then dragged the victim outside, and that she called 911. She heard the victim outside screaming for help, and she ran outside and saw the victim lying on the porch of an apartment across the street, where a family friend of the [Petitioner] lived. The police arrived at the scene approximately fifteen minutes later. Ms. Harris testified that she identified the [Petitioner] as the shooter after viewing a photographic lineup on January 23, 2004.

Audra Woods, the fifteen-year-old daughter of Ms. Harris, testified that she was eleven years old in January of 2004. She testified that she and her five year old half-brother, Marcus, Jr., who was the son of Ms. Harris and Mr. Crawford, were in their own bedroom the entire time that the two men were in the house on the evening of January 19, 2004. Miss Woods testified that she could see into the living room from the foot of her bed, and that she saw the [Petitioner] holding a gun to the victim's head. Miss Woods testified that the gunman wore a gray hooded sweatshirt, and that the other man wore a red hooded sweatshirt. Miss Woods testified that she saw the two men and her mother and the victim go into the master bedroom, that she heard two gunshots, and that she grabbed her little brother and hid in the closet. She testified that she saw the men dragging the victim down the hallway, and that she heard another gunshot when the men were in the living room. Miss Woods stated that after the two men left the house, she went to the living room, looked out the screen door, and saw the men drag the victim across the street and leave him on the porch of an apartment. Miss Woods testified that she spoke with the 911 operator after her mother called to report the shooting and robbery. Miss Woods subsequently identified the [Petitioner] as the man she saw holding a gun to the victim's head, after she viewed a photographic lineup on January 23, 2004.

Andrew Brown testified that he was an officer with the Memphis Police Department. Brown responded to the crime scene at approximately 11:35 p.m. He observed the victim lying on the porch of the apartment complex across the street from 268 Tillman, and he recalled that the victim had been shot once in the back. Officer Brown testified that based upon his own experience and the location of the gunshot wound, he thought Mr. Crawford was in imminent danger of death. He asked the victim who shot

him, and the victim responded, "I don't know right now." Officer Brown tried to calm the victim until the ambulance arrived, and he later learned that the victim died.

Alfred Gardner lived next door to Ms. Harris and her children. He testified that the victim was present at the house periodically. On the night of January 19, 2004, he awoke to the sound of doors being slammed and looked out his window, which was "foggy" from the cold air outside. Gardner stated that he observed two men cross the street and get into the passenger side of a parked vehicle, which he described as a "small minivan." Gardner stated that "one of [the men] was a little taller than the other one." He testified that he saw the vehicle pull away, and that he saw Ms. Harris outside talking on the telephone.

John Hudson, who lived at the apartment in front of which the victim was found, testified that he was a longtime family friend of the victim. On the night of the shooting, he heard knocking at his door, and upon opening the door, saw the victim lying on the porch, bleeding. Hudson testified that the victim called him by his nickname, "Uncle J.R.," and said, "Call the ambulance. I've been shot." Hudson went inside the apartment and called 911. Hudson recalled noticing a cut on the victim's arm. Hudson stated that one of his neighbors provided the victim with a blanket for comfort while they waited for an ambulance.

Sergeant Barry Hanks of the Memphis Police Department testified that he was assigned to investigate the homicide. He visited the crime scene and spoke with Ms. Harris and her daughter regarding the circumstances of the crime and possible suspects in the case. Sergeant Hanks assembled several photographic lineups of suspects. During her viewing of one of these lineups, Ms. Harris identified Reginald Shields as the man who held her against the bedroom wall and took money from her purse. Sergeant Hanks testified that he brought Shields in for questioning, and that Shields admitted he was present at the robbery, but that the [Petitioner] was responsible for shooting the victim. Sergeant Hanks recalled that Shields "minimized his involvement" in the crimes but "knew how much money was taken out of [Ms. Harris's] purse," and that Shields claimed that a third man had been involved. Sergeant Hanks testified that he prepared another photographic lineup of suspects, which contained a photograph of the [Petitioner] and five other individuals, and that on January 23, both Ms. Harris and her daughter identified the [Petitioner] as the shooter from the photographic array.

4

At trial, Reginald Shields testified that he knew the [Petitioner] from their having been "in and out of juvenile facilities together for about five [or] six years." Shields stated that on the date of the robbery and murder, he saw the [Petitioner] with two other people in the neighborhood in a dark blue Ford Explorer. He recalled that the [Petitioner] wore a gray hooded sweatshirt. Shields claimed that the [Petitioner] informed him of his intentions to rob the victims, and that he "pulled a gun on [Shields]" and said Shields was "going to be the watchout." Shields testified that he walked with the [Petitioner] and an unidentified third man, who allegedly wore a red sweatshirt, to Ms. Harris's residence, and that they knocked on the door. Shields stated that when the victim opened the door, the [Petitioner] went into the residence with a gun, that the "third man" went in next, and that he was the last person to enter the residence. Shields said that while they stood in the living room, the [Petitioner] put the gun in the victim's face and demanded marijuana. When the victim responded that he had no marijuana, the men searched the residence. Shields testified that the [Petitioner] took the victim to the master bedroom while he remained in the living room. Shields stated that he heard two gunshots a few minutes later. Shields said that the other two men dragged the victim out of the bedroom, and that he helped them drag the victim to the apartment across the street. Shields testified that he overheard the [Petitioner] and the "other guy" say they had stolen $80 and "a pound of weed."

Officer David Payment testified that he worked with the Crime Scene Investigation unit of the Memphis Police Department, and he described the bullet damage and bloodstains he observed inside Ms. Harris' residence, photographs of which were admitted into evidence. The State concluded its case with the testimony of Dr. O.C. Smith, who was the medical examiner in Shelby County until February of 2004, and who was admitted by the trial court as an expert in the field of forensic pathology. Dr. Smith testified that he performed the autopsy on the victim, Mr. Crawford. Dr. Smith opined that the victim's death was a homicide, caused by a gunshot wound to the back and resulting internal bleeding. Dr. Smith stated that powder burns on the victim indicated that the muzzle of the gun was within two feet from the victim at the time it was fired. Dr. Smith related that the bullet, which he believed to be between a .22 and .45 caliber in size, entered the victim's back, traveled toward his front and downward, causing injuries to his lung, diaphragm, pancreas, and small intestine, and that he found the bullet in the victim's abdominal cavity. Dr. Smith further testified that the victim had another wound to his left forearm, caused by

5

something with a sharp edge, such as metal or glass.

The defense called Sergeant Ernestine Davidson of the Memphis Police Department as a witness. Sergeant Davidson stated that, at approximately 2:00 a.m. in the early morning after the murder and robbery, Ms. Harris initially did not want to come to the homicide bureau and talk to the police, but that she did come to the police station a few hours later that morning. Lieutenant William Woodard, also of the Memphis Police Department, testified that he received a phone call from Ms. Harris on the afternoon after the crimes were committed, and that Ms. Harris told him that a man named "Tony" was responsible for the shooting. Lieutenant Woodard stated that it was his impression that Ms. Harris had received this information by speaking with people in her neighborhood. Lieutenant Woodard testified that he learned that the name "Tony" might have been associated with Reginald Shields, whose middle name he believed was "Antonio."

*Winters*, 2008 WL 2901616, at *1-3.

Based upon this evidence, the jury found the Petitioner guilty of first degree felony murder and aggravated robbery. By operation of law, the trial court imposed a sentence of life imprisonment for the first degree murder conviction. The trial court then sentenced the Petitioner to a consecutive sentence of twelve years for the aggravated robbery conviction.

The Petitioner appealed his convictions and sentence to this court. We affirmed the convictions and the trial court's imposition of consecutive sentences, but we remanded the case for resentencing for the aggravated robbery conviction. *Winters*, 2008 WL 2901616, at *1. On remand, the trial court sentenced the Petitioner to an effective sentence of life in prison.

## B. Post-Conviction Proceedings

In 2014, the Petitioner filed a petition for post-conviction relief, alleging in part that his trial counsel ("Counsel") had been ineffective for unilaterally terminating his right to a Rule 11 appeal. The parties presented the following evidence as relevant to the issues presented on appeal: The Petitioner testified that Counsel did not speak with his juvenile court counselor, Ms. McKisset, whom the Petitioner wanted to call at trial as a character witness. The Petitioner said that he had a juvenile record and felt that his appointed counselor would provide insight into his character, testifying that this incident was out of his character. Further, he opined that Ms. McKisset could have contradicted

6

some of the testimony offered against him by his co-defendant. The Petitioner testified that Ms. McKisset could refute his co-defendant's testimony that the two met while housed in a juvenile facility together. The Petitioner testified that his juvenile convictions included burglary and assault but not robbery or murder.

The Petitioner noted that Audra Woods told the investigator that, while she saw the clothing of the intruders, she "didn't see [their] faces." At trial, however, she testified that she saw the Petitioner's face and that she identified him from a photographic lineup. The Petitioner opined that Counsel did an ineffective job of cross-examining this witness regarding her previous statement. He further opined that this issue should have been resolved with a motion to suppress.

The Petitioner testified that a man named Earl Smith told the police that he was in a store with another man when he overheard Ms. Harris accuse someone else of shooting the victim. The Petitioner felt that Counsel should have called Mr. Smith to testify. He said that Counsel should have offered evidence that Ms. Harris accused two other people of committing this murder, in addition to him. The Petitioner said that Counsel also did not question Ms. Harris regarding her theft of property conviction. Counsel attempted to do so, but he did not properly ask the question of the witness, and the proof lost its impact.

The Petitioner testified that the State objected several times to the form of Counsel's questions during cross-examination. There were "several" sidebars during which the trial court had to tell Counsel that he was not properly asking questions of the witnesses. The Petitioner said that "every time it got to a point where [Counsel] could impeach a witness," he would incorrectly ask the question and have to stop.

The Petitioner testified regarding his request for Counsel to represent him on a Rule 11 appeal, to which he received no response.

During cross-examination, the Petitioner explained that had Counsel investigated the crime scene more thoroughly, then he would have been able to more effectively cross-examine the witnesses. He expounded that one of the crime scene detectives testified that Ms. Woods would not have been able to see the shooter from her vantage point. Counsel would have known this had he been more prepared. The Petitioner agreed that the jury heard the detective's testimony regarding Ms. Woods's vantage point during the shooting. He further agreed that this evidence came in response to Counsel's questioning.

The Petitioner agreed that Counsel asked for a continuance because he could not locate one of the Petitioner's witnesses, Earl Shields. He said, however, that Counsel

should not have waited until trial to do so.

The Petitioner agreed that Counsel sent him a letter stating that Counsel would not be filing a Rule 11 appeal on the Petitioner's behalf. The letter also provided instructions informing the Petitioner how to file a Rule 11 on his own.

Counsel testified and agreed that his relationship with the Petitioner was turbulent. He described the Petitioner as becoming angry when the two disagreed on strategy, which made communication difficult. At one point the Petitioner became angry, banged on a desk and made a threat toward him, so Counsel asked to withdraw from the case. The trial court denied his request. From that point forward, Counsel brought an investigator with him when he met with the Petitioner. Counsel described their relationship as becoming "bearable" and confirmed that their relationship did not affect his trial performance.

Counsel said that, for the majority of the time he represented the Petitioner, the only witness that the Petitioner offered was Markeith Wilson, his alibi witness. Counsel said he had a letter to the Petitioner memorializing as much. Despite this, the investigator, Don Gray, attempted to contact the entire list of witnesses provided by the State. He said that a lot of the witnesses had warrants out for their arrest, so it was difficult to get them to cooperate with an interview. His only option was to subpoena them to trial, which he did in a timely manner. Counsel agreed that Mr. Gray could not interview any of the witnesses because he could not find any of the witnesses.

Counsel said that the Petitioner maintained that he had an alibi witness, and he repeatedly told Counsel that he was not present at the shooting. Counsel assumed that the Petitioner would want to explain to the jury where he was during the shooting. When Counsel learned that Mr. Wilson planned to testify that he was not with the Petitioner on the day of the shooting, Counsel told the Petitioner that he was going to need to testify to establish an alibi. The Petitioner informed him adamantly that he did not want to testify. The Petitioner then offered that he would like to present evidence of voluntary manslaughter, and Counsel informed him that this theory was completely contradictory to the theory that he had an alibi.

Counsel agreed that he asked for a continuance to find Earl Smith, explaining that his investigator called him shortly before trial saying that there was another place he could look. While the trial court denied his motion, the investigator attempted to find Mr. Smith while the trial was ongoing, but was unsuccessful. He hoped that Mr. Smith would have testified that he heard Ms. Harris identify someone else as the shooter.

Counsel testified that he did not believe that a Rule 11 request for permission to

appeal would be granted, based on the issues presented on appeal. He, therefore, timely informed the Petitioner of this belief.

During cross-examination, Counsel testified that he did not interview the witnesses himself because he trusted the investigator to do so. Counsel identified a letter he wrote and hand-delivered to the Petitioner, confirming the Petitioner's decision not to testify. It also discussed the difficulty in presenting a voluntary manslaughter defense because the Petitioner maintained that he was not present during the shooting. The letter mentioned the issues of finding the alibi witness, whom Counsel had subpoenaed.

Counsel testified that the trial court denied his motion for a continuance to look for the alibi witness, reasoning that if Counsel had been unsuccessful in finding the witness in the previous two years then he was unlikely to find him if granted a continuance.

Counsel said that he knew the trial was going to be challenging because the State had two witnesses who identified the Petitioner's photograph from a photographic lineup along with a co-defendant who identified the Petitioner. He explained this to the Petitioner. The Petitioner offered him the name of only one witness, Mr. Wilson, whom the investigator attempted to locate.

Counsel recalled that, when the trial court denied his motion to withdraw, he informed the Petitioner that he had already had a different attorney removed from his case.

Counsel agreed that he questioned Ms. Harris about her previous theft conviction. He said he also used the witnesses' statements during their cross-examination. He asked each witness about inconsistent testimony. The State objected, and the trial court ruled in his favor.

Upon questioning from the post-conviction court, Counsel testified that he filed, among others, a motion in limine to exclude photographs, a motion to suppress Ms. Harris's and Ms. Woods's identification of the Petitioner, a motion for disclosure of any impeachment evidence, a motion to review witness statements, a motion for severance from his co-defendants, and a motion for continuance.

Based upon this evidence, the post-conviction court filed a written order. In it, the court concluded that Counsel had been ineffective for failing to file a Rule 11 appeal to the Tennessee Supreme Court. The post-conviction court ordered that the Petitioner be allowed to file a delayed Rule 11 appeal.

The Petitioner filed his delayed Rule 11 appeal. The Tennessee Supreme Court

9

denied the Petitioner's delayed Rule 11 application for permission to appeal. *State v. Trumaine Winters*, No. W2007-00529-SC-R11-CD (Tenn. Apr. 13, 2015). Our supreme court also noted that there was no final judgment on the other claims raised in the post-conviction petition. *Id.* The case was therefore remanded to the post-conviction court.

Upon remand, the post-conviction court appointed the Petitioner counsel, who amended the petition for post-conviction relief on May 21, 2018. In that amended petition, the Petitioner contended, as relevant to this appeal, that Counsel had: (1) failed to object to improper arguments made by the State during closing arguments; and (2) been ineffective in cross-examining the State's witnesses LaDonna Harris, Audra Woods, and Reginald Shields.

The post-conviction court held a second hearing during which the parties presented the following evidence: The Petitioner testified that Counsel failed to object to improper closing argument made by the State. He said that the prosecutor stated during the trial that "people hold their gun a certain way" in order to explain the trajectory of the bullet. He said, however, that the evidence was not introduced at trial to support the State's assertion. Counsel did not object to this statement. The Petitioner also took issue with the prosecutor using his co-defendant's testimony, even though his co-defendant had lied during the trial. The Petitioner thought Counsel was ineffective for failing to object to the State's closing argument that the witnesses' testimony corroborated each other.

The Petitioner testified that Mr. Shields, his co-defendant, made a statement to police officers that differed from his trial testimony. Counsel, he said, never highlighted that to the jury.

The Petitioner also felt that Counsel did not adequately cross-examine Ms. Harris and Ms. Woods. He said that Counsel should have questioned Ms. Woods about her vantage point at the time of the shooting and whether she could have seen the shooter. He agreed that Counsel asked Officer Payment, the investigating officer, if Ms. Woods could have seen the shooter from her vantage point, and Detective Payment said no. Detective Payment, however, testified after Ms. Woods, and the Petitioner felt that Counsel did not adequately question Ms. Woods about her line of sight. The Petitioner further opined that Counsel should have impeached Mr. Shields further.

The Petitioner also took issue with the fact that it never came out at trial that he came from a "well-to-do" family and had no motive to rob or kill the victim.

During cross-examination, the Petitioner testified that he filed several bar complaints against Counsel. The Petitioner agreed that both Counsel and the State impeached Mr. Shields, but he said that Mr. Shields's testimony was perjury. The

Petitioner said that Counsel should have recalled Ms. Woods and asked her about Detective Payment's testimony.

The Petitioner expressed concern that several of the witnesses said that the victim had been dragged from the scene, and the first responder and other witnesses said that the victim had run from the scene.

During cross-examination, the Petitioner agreed that this court on appeal concluded that there was sufficient evidence to support his conviction.

On October 18, 2018, the post-conviction court issued an order denying the Petitioner's petition. It found as relevant to this appeal:

> **[Counsel] was not ineffective for failing to impeach witnesses and object to witnesses brought by the prosecution.**
>
> Petitioner asserts that [Counsel] was ineffective for failing to properly impeach and object to witnesses. Petitioner points specifically to a few instances within the record where the trial judge corrected [Counsel's] questioning and allowed [Counsel] to change his questioning to fit the proper form. . . . Petitioner contends that he was prejudiced by these objections, and that, had [C]ounsel properly asked these questions, important evidence would have been admitted. However, during each of the three cited portions of the transcript, the trial judge desired evidence to be brought forward properly. . . . . Petitioner has not stated which witnesses [Counsel] should have objected to. The court finds that these errors did nothing to prejudice Petitioner's defense, and Petitioner is not entitled to relief.
>
> **[Counsel] was not Ineffective for Failing to Object During Closing Arguments**
>
> Petitioner asserts that [C]ounsel's failure to object during the State's closing argument constituted unreasonably deficient assistance of counsel. Specifically, Petitioner testified that [C]ounsel should have objected to the State's reference to testimony provided by witnesses who had been impeached. . . . . It seems as though Petitioner expected any inconsistencies in witness' testimony to be stricken from the record instead of merely highlighted for the jury via impeachment. . . . In [P]etitioner's own words his contention is "ineffective assistance of counsel due to [Counsel's]

11

failure to object to prosecutor misconduct and not correcting false testimony during the trial." . . .

**[Counsel] was not Ineffective During Cross Examination and Impeachment**

At the hearing, Petitioner repeatedly claimed that [C]ounsel failed to properly impeach opposing witnesses, "it's one thing about getting these that get up and say stand, but you've got to discredit these witnesses. You can't just say well did you say this, did you say that, like impeach these people." . . . . Here and in several other instances, Petitioner admitted that [Counsel] had an opportunity to and did cross-examine the State's witnesses. . . . [The] Petitioner repeatedly claimed that [C]ounsel failed to impeach the state's witnesses and described moments from trial where he thought this occurred; but, each time Petitioner did so he actually described moments where [C]counsel brought out inconsistencies in witness' testimony and effectively impeached them before the jury. . . .

[The] Petitioner's real argument seems to be that these inconsistencies were not highlighted enough. . . . During the hearing, [the] Petitioner conflated impeachment of witness testimony with that of evidence being stricken from the record and/or prosecution for perjury. . . . . In addition to the impeachment issue, [the] Petitioner also testified that he thought [C]ounsel should have objected more. . . .

. . . .

## CONCLUSION

[The] Petitioner has failed to meet his evidentiary burden in support of this petition for post-conviction relief. [The] Petitioner has failed to prove that (1) [C]ounsel's performance was unreasonably deficient, and that (2) [C]ounsel's deficient performance prejudiced the defense. [The] Petitioner has failed to state a cognizable claim for relief through this Petition for Post- Conviction Relief. Accordingly, this Petition for Post-Conviction Relief is DENIED.

It is from this judgment that the Petitioner now appeals.

**II. Analysis**

12

On appeal, the Petitioner contends that the post-conviction court erred when it denied his petition. He maintains that Counsel was ineffective when he cross-examined the State's witnesses and because he failed to object to the State's closing arguments. The State counters that the Petitioner has not proven that Counsel was ineffective in either regard. We agree with the State.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2014). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2014). The post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates against it. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999); *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997). A post-conviction court's conclusions of law, however, are subject to a purely de novo review by this Court, with no presumption of correctness. *Id.* at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the

range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Strickland*, 466 U.S. at 688).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland,* 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. *Strickland*, 466 U.S. at 690; *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation." *House*, 44 S.W.3d at 515 (quoting *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

## A. Cross-Examination of State's Witnesses

The Petitioner contends that Counsel failed to properly impeach the State's witnesses and that, because there was no physical evidence tying him to the crime scene, Counsel should have challenged their credibility. The Petitioner notes that Ms. Woods testified during the suppression hearing and at trial that she saw the shooting. Detective

14

Payment later testified that it would have been impossible to see the shooting from Ms. Woods's vantage point. The Petitioner contends that, while Counsel brought out this testimony from Detective Payment, he was ineffective for not also using it to cross-examine Ms. Woods. The Petitioner further takes issue with the fact that Ms. Harris, Ms. Woods, and co-defendant Shields all testified that the victim was dragged from the scene, despite other witnesses who testified that the victim left the scene of his own volition after the shooting. The Petitioner states that it was ineffective for Counsel not to cross-examine the three witnesses more thoroughly using the evidence that the victim was not dragged from the scene. Finally, the Petitioner contends that Counsel did not confront Ms. Harris, who said the shooting occurred from a distance of two bed-lengths, with the medical examiner's finding that the shooting occurred from a gun a few inches from the victim. He concedes that the medical examiner testified after Ms. Harris, but he argues that this evidence was available from the medical examiner's report. The Petitioner cites *Jay Dee Garrity v. State*, M2016-01463-CCA-R3-PC, 2018 WL 1691296, at \*1 (Tenn. Crim. App., at Nashville, Feb. 22, 2018), *no Tenn. R. App. P. 11*, to support his contention that he is entitled to post-conviction relief based upon Counsel's allegedly improper cross-examination.

The State counters that Counsel effectively cross-examined the three witnesses. It first notes that Counsel questioned Ms. Woods about her statement to police that her bedroom door was shut, so she did not see and could only hear the gunshots. Ms. Woods denied this during the trial, maintaining that she saw the shooting, but the State contends that Counsel effectively cross-examined her. The State further contends that Counsel questioned the witnesses about whether the victim was dragged from the scene and that he did so effectively. Next, the State contends that Ms. Harris actually testified that "there wasn't too much distance" between the shooter and the victim, clarifying that they were standing on the same side of the bed, and only "[f]eet or inches" from the shooter. This, the State notes, was consistent with the medical examiner's testimony. Finally, the State posits that *Garrity* is distinguishable from the present case because Counsel did, in fact, effectively cross-examine the witnesses. We agree with the State.

After reviewing the record, we agree with the post-conviction court that Counsel effectively cross-examined each of the witnesses. He asked Ms. Woods about her ability to see the shooting and identify the shooter. He questioned the witnesses about whether the victim was dragged from the scene, although we fail to see how further questioning in this regard would have benefitted him. The witnesses contradicted each other, a fact true in many trials, and it is a jury determination about which portions of which witnesses' testimony should be believed. We further agree with the State that Ms. Harris's testimony did not contradict the medical examiner's findings.

In *Garrity*, this court recently granted post-conviction relief to a petitioner based

15

upon his counsel's failure to adequately cross-examine witnesses. 2018 WL 1691296, at *13-14. In that instance, the petitioner's trial counsel failed to cross-examine two witnesses at all and failed to cross-examine a third about inconsistencies in their statement. *Id.* We find *Garrity* distinguishable from the case herein. In this case, Counsel cross-examined each of the witnesses and did so effectively. The Petitioner complains that Counsel should have asked the witnesses more questions regarding discrepancies and/or inconsistencies, but we conclude that he has not shown that Counsel's performance fell below a reasonable standard in this regard. Further, we conclude that he has not proven that he was prejudiced by Counsel's performance.

## B.  Failing to Object to Closing Argument

The Petitioner contends that Counsel was ineffective because he failed to object when the prosecutor during closing argument referred to facts that were not in evidence and when the prosecutor made inaccurate statements about the evidence. Specifically, he contends that the prosecutor inaccurately stated that the testimonies from Ms. Harris, Ms. Woods, and co-defendant Shields corroborated each other, despite the fact that there were inconsistencies in their testimonies. The Petitioner also contends that the prosecutor committed misconduct when she showed the jury how the Petitioner may have held the gun. The State counters that the Petitioner did not question Counsel about his decision not to object during the post-conviction proceedings, which could have been a strategic one. We agree with the State.

In *Robinson v. State*, No. W2011-00967-CCA-R3-PD, 2013 WL 1149761, at *80 (Tenn. Crim. App., at Jackson, Mar. 20, 1013), *perm. app. denied* (Tenn. Aug. 14, 2013), a case cited by the State, we held that when trial counsel was not questioned at the post-conviction hearing regarding a failure to object to the prosecutor's statements, we must conclude that counsel was not ineffective. That case is instructive here, as Counsel was not questioned regarding his failure to object.

Further, as noted by the State, the Petitioner offers no citations to the record supporting his contentions about what occurred during closing argument. Rule 27(a)(4) of the Tennessee Rules of Appellate Procedure requires that an appellant's brief include a statement of the issues presented for review. "[A]n issue may be deemed waived when it is argued in the brief but is not designated as an issue in accordance with Tenn[essee] R[ule] App[ellate] P[rocedure] 27(a)(4)." *Hodge v. Craig*, 382 S.W.3d 325, 335 (Tenn. 2012). Rule 27 also requires that the appellant's brief contain an argument setting forth "the contention of the appellant with respect to the issues presented, and the reasons therefore, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record." Tenn. R. App. P. 27(a)(7)(A). Failure to comply with this basic rule will ordinarily constitute a waiver of

16

the issue. *State v. Hammons*, 737 S.W.2d 549, 552 (Tenn. Crim. App. 1987). Likewise, the rules of this court establish that "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b). Accordingly, we conclude that the Petitioner has waived this issue by failing to include the appropriate references to the record.

In the Petitioner's reply brief, he also contends that the prosecutor committed misconduct by failing to correct false testimony. We conclude that this issue, raised for the first time on appeal, is not properly before this court. *See e.g. Cauthern v. State*, 145 S.W.3d 571, 599 (Tenn. Crim. App. 2004) ("[A]n issue raised for the first time on appeal is waived.").

Additionally in the reply brief, the Petitioner contends that Counsel was ineffective for failing to present evidence of the Petitioner's personal and social history to support his innocence. About this issue, the post-conviction court found that, while Counsel could have offered this evidence, it was within Counsel's "umbrella of trial strategy" not to do so because it could have opened the door to more damaging evidence, namely the Petitioner's past offenses. We agree. As stated above, it is not this court's job to second guess trial counsel's reasonable but unsuccessful trial strategy, and we will not do so here. The Petitioner is not entitled to relief on this issue.

### III. Conclusion

After a thorough review of the record and the applicable law, we conclude the post-conviction court properly denied the Petitioner's petition for post-conviction relief. In accordance with the foregoing reasoning and authorities, we affirm the judgment of the post-conviction court.

_____
ROBERT W. WEDEMEYER, JUDGE

17